# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**GINA SLONE,**

      **Plaintiff,**

**-vs-**                                            **Case No.  8:09-CV-1175-T-27TGW**

**SHERIFF GRADY JUDD, et al.,**

      **Defendants.**

_____/

## ORDER

**BEFORE THE COURT** are (1) Defendants' Motion for Summary Judgment and Supporting Memorandum (Dkt. 57) and Plaintiff's Reply (Dkt. 109); (2) Defendants' Motion to Strike Testimony of Melvin Tucker ("objection to testimony") (Dkt. 113) and Plaintiff's Response (Dkt. 118);[1] and (3)  Defendants' Motion to Strike Exhibits 2 Through 22 of Plaintiff's Reply to Defendants' Motion for Summary Judgment ("objection to exhibits")(Dkt. 114) and Plaintiff's Response (Dkt. 117).

### Dkt.  113: Defendants' Motion to Strike Testimony of Melvin Tucker

Defendants object "in whole or in part" to the expert report and deposition testimony of Plaintiff's expert, Melvin Tucker ("Tucker").  Defendants argue that (1) Tucker's amended report and amended errata sheet are untimely because they were served by Plaintiff after the discovery cut-off and (2) Tucker's report and deposition testimony should not be considered to the extent that Tucker opines as to the Defendants' subjective intent and knowledge.

---

[1]  Notwithstanding that the Case Management and Scheduling Order required "citations to the record," the parties have failed to cite docket entries with respect to deposition testimony throughout their lengthy filings. In many instances, they fail to cite the record at all. The parties' failure to comply with the order has resulted in a difficult and laborious task of locating and verifying the factual recitations of both parties, some of which, as noted, are not verified by the record citations.

**Amended Report and Errata Sheet**

Tucker provided a timely Rule 26 Report.  His deposition was taken on September 22, 2010. Plaintiff argues that Tucker's Amended Report and Errata Sheet, although admittedly late, does not materially alter Tucker's opinions, although Plaintiff acknowledges that Tucker applied a corrected standard to his analysis after a court ruling.  Plaintiff also points out that she offered Defendants the opportunity to re-depose Tucker at no expense to Defendants.

Rule 37(c)(1) provides that "a party that without substantial justification fails to disclose [required information]… is not, unless such failure is harmless, permitted to use as evidence at trial… any witness or information not so disclosed."  Plaintiff concedes that Tucker's Amended Report and Errata Sheet were filed after the discovery deadline and offers a reasonable explanation of  the circumstances contributing to the late filing.  Defendants have not asserted or demonstrated any prejudice as a result of the late filing.  Under the circumstances, the late filing is harmless. *See Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996).  Defendants' request to strike Tucker's Amended Report and Errata Sheet is denied.

**Subjective Intent**

Defendants object to Tucker's report and deposition testimony to the extent Tucker opines on the individual Defendant's subjective intent.  This objection is premature.  Plaintiff does not rely on Tucker's opinions regarding subjective intent in opposing summary judgment.[2]  Defendants' objection is overruled.

---

[2]  Tucker's opinion testimony would not create a jury issue regarding Defendants' subjective mental intent. *See Campbell v. Sikes*, 169 F.3d 1353, 1368-72 (11th Cir.1999).  Only direct and circumstantial evidence can create a factual issue regarding Defendants' subjective mental intent. *Id*. at 1372.

**Dkt. 117:  Defendants' Motion to Strike Exhibits 2 Through 22 of Plaintiff's Reply to Defendants' Motion for Summary Judgment (construed as objections to exhibits**)

Initially, "Rule 12(f) is not the appropriate procedural vehicle  for objecting to materials submitted with respect to a motion for summary judgment. Rather, motions to strike are considered as  objections to the materials filed.  *Sklar v. Clough*, 2007 U.S. Dist. LEXIS 49248, 2007 WL 2049698 at *1 (N.D. Ga. July 6, 2007)).   Accordingly, the instant motions are construed as objections to the materials filed by Plaintiff in support of her Reply to Defendant's Motion for Summary Judgment.

In their objections, Defendants move the Court to strike Exhibits 2 through 22 of Plaintiff's Reply  (see Dkt. 109).  Exhibits 2 through 4 are medical records pertaining to the decedent, James Griffin.  Exhibits 5 through 20 and 22 are sworn witness statements taken by Detective Brigman, who investigated Griffin's death.  Exhibit 21 is a newspaper article. Defendants broadly contend that these exhibits "are unauthenticated and otherwise inadmissible." (Dkt. 114 at p. 1).

Plaintiff points out that Exhibit 2 was authenticated by Karen Riley during her deposition. Plaintiff also points out that Exhibits 4 through 20 and 22 were part of Brigman's investigative report and that he authenticated the report during his deposition.  Plaintiff argues that these exhibits are authenticated as public records under Rule 901(b)(7).  astly, Plaintiff argues that Exhibit 21, the newspaper article, is self-authenticated under  Rule 902(6).[3]  As to the admissibility of the exhibits, Plaintiff asserts that "Defendants did not allege that any of Plaintiff's exhibits were inadmissible hearsay[.]" (Dkt. 117 at p. 8).

---

[3] Plaintiff does not indicate whether Exhibit 3 has been authenticated or is admissible.

**Analysis**

"On motions for summary judgment, [a court] may consider only that evidence which can be reduced to an admissible form." *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005). "Authentication is a 'condition precedent to admissibility.'" *Snover v. City of Starke*, 2010 U.S. App. LEXIS 20238, at *8 (11th Cir. Sept. 30, 2010) (unpublished opinion) (quoting Fed. R. Evid. 901(a)). To be considered, a document must be authenticated, either by affidavit that satisfies Rule 56(e) or in otherwise is in accord with the Federal Rules of Evidence. *Williams v. Eckerd Family Youth Alternative*, 908 F. Supp. 908, 911 (M.D. Fla. 1995) (citations omitted). Federal Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what the proponent claims." Fed. R. Evid. 901(a).

**Exhibits 8 through 20 and 22**

Exhibits 8 through 20, and 22 are sworn witness statements by several Defendants taken by Brigman as part of his investigation. Fed.R.Evid. 801(d)(2)(A) provides: "A statement is not hearsay if . . . [t]he statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity . . . ." "Sworn statements are clearly admissible as an admission of a party against interest[.]" *McIntosh v. Eagle Fire Co.*, 325 F.2d 99, 100 (8th Cir. 1963). If authenticated, these statements are therefore admissible as admissions.[4]

---

[4]Alternatively, Plaintiff is correct that Defendants have not specifically alleged that Plaintiff's exhibits are inadmissible hearsay (*see* Dkt. 117 at p. 8). Defendants assert that the specified exhibits are "unauthenticated and otherwise inadmissible." Defendants have not specifically identified any exhibits or particular statements as inadmissible hearsay. "The court is not inclined to comb through these documents, identify potential hearsay, and determine if an exception applies - all without guidance from the parties." *See Burch v. Regents of the University of California*, 433 F.Supp.2d 1110, 1124 (E. D. Cal. 2006). Thus, to the extent they assert that the exhibits our inadmissible, the motion will be denied.

"Documents produced during discovery 'are deemed authentic when offered by a party opponent.'" *Wells v. Xpedx*, 2007 U.S. Dist. LEXIS 67000,  2007 WL 2696566 at *4 (M.D. Fla. Sept. 11, 2007) (quoting *Sklar v. Clough*, 2007 U.S. Dist. LEXIS 49248, 2007 WL 2049698 at *4 (N.D. Ga. July 6, 2007)). *See also Health Care Serv. Corp. v. Mylan Labs., Inc. (In re Lorazepam & Clorazepate Antitrust Litig.)*, 2005 U.S. Dist. LEXIS 6802 (D.D.C. Apr. 22, 2005) ("[I]f a party produces a document in response to a discovery demand or subpoena, it cannot then argue that, despite its production, the document is not authentic.").

Plaintiff also asserts that the witness statements are authenticated because Defendants produced them during discovery by virtue of a subpoena duces tecum issued to Brigman (Dkt. 117 at p. 4; Dkt. 117-1).  Moreover, Plaintiff correctly asserts that the exhibits are authenticated under Fed. R. Evid. 901(b)(7) as they are part of Brigman's investigative report, a public record.  "The proponent of the document may also present evidence that a purported public record is from the public office where such records are kept." *Gregg v. Ohio Dep't of Youth Servs.*, 661 F. Supp. 2d 842, 852 (S.D. Ohio 2009).  Each exhibit bears the letterhead of Sheriff Grady Judd.  Each exhibit bears Brigman's name.  During their depositions, each Defendant confirmed that they gave a statement to Brigman.  These circumstances demonstrate that the exhibits are what they purport to be.  They have been authenticated.  Defendants's objections to Plaintiff's Exhibits 8 through 20 and 22 are overruled.

### Exhibits 5 through 7

Exhibits 5 through 7 are sworn statements taken by Brigman from prisoners who witnessed some of the events relevant to Plaintiff's claims and made a part of his investigative report.  These exhibits are authentic for the same reasons.  As to admissibility, inadmissible evidence may be used

to oppose summary judgment so long as there is no indication that the facts could not be reduced to admissible evidence at trial. *See e.g., Macuba v. Deboer*, 193 F.3d 1316, 1322-24 (11th Cir. 1999) (Even though a document references hearsay information, that information may be considered on summary judgment if it would be admissible at trial under an exception to the hearsay rule or as non-hearsay.).

Even if Defendants are challenging these statements as hearsay, Defendants do not contend that the information would not be admissible if the witnesses testified at trial.  The statements are purportedly based on personal knowledge.  Nothing indicates that these prisoners could not be called to testify.  As Defendants have not made that showing, the evidence may be considered in disposing of the summary judgment motion.  Defendants's objections to Plaintiff's Exhibits 5 through 7 are overruled.

**Exhibit 21**

Exhibit 21 is a newspaper article from The Ledger.com.  The article is inadmissible hearsay and will not be considered.  Newspaper articles are inadmissible hearsay when "relevant primarily to establish the truth of their contents." *United States v. Baker*, 432 F.3d 1189, 1211-12 (11th Cir. 2005).  Plaintiff proffers no means by which the article would be admissible (*See* Dkt. 117 at p. 7). Defendants' objections to Exhibit  21 are sustained.

**Exhibits 2 through 4**

Exhibits 2 through 4 are medical records of the Polk County Jail regarding the James Griffin.  Although Defendants contend that Exhibits 2 through 4  "are unauthenticated by anyone,"  they do not actually contest their authenticity. (Dkt. 114 at p. 1).  Indeed, Exhibit 2 is a copy of the same document Defendants filed as an exhibit in support of their motion (*See* Dkt. 98-1 at pp. 7-9).

Exhibit 4 is authenticated as part of Brigman's investigation report.  Under these circumstances,
"whether the authentication requirement should be applied to bar evidence when its authenticity is
not actually disputed is, however, questionable." *Burch*, 433 F.Supp.2d at 1120.  Defendants'
objections to Exhibits 2 through 4 are overruled.

**Dkt. 57: Defendants' Motion for Summary Judgment**

### BACKGROUND

On March 19, 2006, James Lee Griffin ("Griffin") died while detained at the Polk County
Jail.  Plaintiff, Griffin's mother and personal representative, brought this 42 U.S.C. § 1983 action
against Grady Judd, Sheriff of Polk County, and seventeen Polk County deputies, alleging violations
of Griffin's constitutional right to be free from excessive force and deliberate indifference to
Griffin's serious medical needs.  Plaintiff also alleges state law claims that the deputies and Judd are
liable for assault and battery and that Judd is liable for negligent hiring, training, supervision, and
retention of the deputies, vicariously liable for their negligence, and liable  for their actions under
Florida's "undertaker doctrine."

### STANDARD OF REVIEW

Summary judgment is proper if following discovery, the pleadings, depositions, answers to
interrogatories, affidavits and admissions on file show there is no genuine issue as to any material
fact, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477
U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable
substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357
F.3d 1256, 1259-60 (11th Cir. 2004).  "An issue of fact is 'genuine' if the record taken as a whole
could lead a rational trier of fact to find for the nonmoving party." *Id*. at 1260.  Once the movant

demonstrates the absence of a genuine issue of material fact, the nonmoving party cannot rest on the pleadings but must designate specific facts through the use of affidavits, depositions, answers to interrogatories and admissions on file to show that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24.

The Court will not weigh the evidence or make findings of fact. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court must view all facts that are genuinely disputed, and draw all inferences that are reasonably supported by the record, in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 380, 381 n.8 (2007). All reasonable doubts about the facts should be resolved in favor of the party opposing summary judgment. *Galvez v. Bruce*, 552 F.3d 1238, 1241 (11th Cir. 2008). The Court's role, then, is limited to "deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party." *Morrison*, 323 F.3d at 924 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## DISCUSSION

### Facts viewed in light most favorable to non-moving party

At the time of his death, Griffin was 21 years old, 6'1", 269 pounds (Dkt. 68 at p. 36). When he was 18, his mother suspected that he was having mental health issues (Id. at p. 28). He was reclusive, moody and hearing voices (Id. at pp. 17-18; 48). He was often agitated, red faced, and sweated profusely (Id. at p. 35). He often took his shirt off and began pacing (Id.). She had him involuntarily committed under Florida's Baker Act several times (Id. at pp. 29, 60).[5] When hospitalized, he was restrained and sedated (Id. at pp. 37, 39).

---

[5] Plaintiff argues the "[t]he PCSO Baker Acted Griffin on at least 7-8 prior occasions and thus obviously had collective knowledge of his [Griffin's] mental illness." (Dkt. 109, p. 2). Actually, the cited transcript of Plaintiff Gina Slone describes her own actions in having her son Baker Acted. She does not identify the agency responsible for implementing any of those involuntary commitments. Plaintiff's argument that the PCSO "obviously" knew of Griffin's mental illness is not therefore supported by cited record.

Griffin was prescribed medication for his mental health issues but had not been taking it for several months before his death (Id. at pp. 43-44; 53).  The last time Plaintiff saw her son, he was behaving strangely.  She was considering having him Baker Acted again. (Id. at pp. 62, 65).  However, he left his mother's house and met Juan Nino ("Nino") at a restaurant at about 2:30 a.m. on March 18, 2006 (Dkt. 76 at pp. 22-23).  He became  involved in an altercation with another patron.  Officers from the Lake Wales Police Department responded and arrested Griffin (Id. at pp. 26-28).  Nino told the officers that Griffin was bipolar and on medication (Id. at pp. 26-27).  Griffin was compliant with the officers and did not resist arrest (Id. at pp. 32-33).

Griffin was  booked into the Polk County Jail ("PCJ") (Dkt. 85 at pp. 38-40).  This was not the first time he had been incarcerated there (Id.).  During prior incarcerations, Griffin had informed medical personnel that he had been hospitalized and treated for a psychiatric problem and was taking medications for his psychiatric problems (Dkt. 109-2, 109-3, 109-4). (Id.).

When he arrived at PCJ on March 18, 2006, Griffin was "loud, belligerent, and (verbally) aggressive" (Dkt. 85 at p. 40-41).  His "skin was flushed, reddish." (Id.).  He was beating on the door and creating a disturbance (Id. at p. 41).   Because he was inhibiting officers from receiving information from the arresting officer, Deputy Albritton, who knew Griffin as a "volatile type person" from prior arrests, moved Griffin from the front holding cell to another cell in the back, away from the area (Id. at pp. 39; 41-42; 45).  While being removed from the cell, Griffin recognized Albritton, addressed him by name, was "very cordial, polite" and complied with his orders (Id. at p. 45).  Albritton escorted Griffin to another cell (cell #1) without incident (Id. at pp. 47-48).  However, approximately two minutes later, Griffin became loud and was verbally abusive toward an intake clerk (Id.).  According to Albritton, Griffin's behavior was "normal for James" based on his past interactions, but not normal for others (Id. at pp. 48-49).

Albritton moved Griffin from the cell to have him photographed and finger printed (Id. at pp. 51-52). Albritton took his photograph (Id. at p. 53) and Wiegert took his fingerprints (Id.; Dkt. 80 at p. 16). Griffin was polite and obeyed the officers (Dkt. 85 at pp. 54-55; Dkt. 80 at p. 21). Weigert recalled that Griffin was compliant, "doing everything he was supposed to do" (Dkt. 80, p. 21). She "didn't get the feeling of anything other than Griffin was ticked off about being in jail" (Id. at pp. 21-22). He was placed in a holding cell where he created a disturbance by beating on the cell door and making loud noises (Id. at p. 41).

Albritton took Griffin to change his clothes and escorted him to cell #4  (Id. at pp. 54-55). Approximately 15 to 30 minutes after Griffin was returned to the cell, other prisoners began knocking on the door and pointing at Griffin, concerned about his behavior (Id. at pp. 55-56). Griffin was pacing in circles, yelling, kicking and beating on the cell door (Id.). Albritton removed Griffin from cell #4 and placed him alone in Cell # 8, "for him to wait to be interviewed by medical and pretrial" (Id. at p. 58). Cell #8 is  padded to prevent the detainee from harming himself (Id. at p. 58; Dkt. 64 at p. 17). Albritton had no problem with Griffin after he moved him into cell #8 (Dkt. 85 at p. 59). According to Albritton, "[w]henever I addressed Mr.  Griffin, his tone and his aggression immediately toned down a few notches . . ." (Id.). While he was in the cells, Griffin's behavior was poor (Id. at pp. 66-67). When he was removed from the cells, Griffin calmed down and was compliant (Id. at p. 66).

The pretrial service declined to interview Griffin.  Later, Albritton escorted Griffin to the nursing station (Id. at p. 61). Griffin told the nurse that he was bipolar and was on medication (Dkt. 109-9 at p. 4). Griffin became loud and refused to answer any questions from the nurse (Dkt. 85 at pp. 61-62; Dkt. 58). Albritton "may have told her he was acting bipolar and that she might want to

take a look at that and see what she thought" (Id. at p. 62).  Because Griffin was not answering the

nurse's questions and was belligerent, the interview lasted only about 30 seconds (Dkt. 85 at pp. 63-

64).  The nurse noted a history of mental health problems and assigned him to general population

(Id.; Dkt. 58).  Pursuant to the contract between PCSO and Correctional Medical Services ("CMS"),

CMS provides medical care to inmates (Dkt. 78, p. 7; 64).  Medical personnel employed by CMS

determine where to house inmates and make the assessment of whether an inmate has mental health

issues warranting housing in the Special Needs Unit ("SNU")(Dkt. 64, pp. 11-13).

After Griffin saw the nurse, Albritton escorted him back to Cell #8 without incident (Dkt.

85 at 64).  Griffin was quiet for a few minutes but became loud again and began yelling and kicking

on the door (Id. at pp. 64-65).  His behavior was worse than it had been in Cell #4. He told the

officers to "bring an army" if they needed to take him out and that they "would have to go through

God." (Id. at p. 65).  At some point, Albritton suggested to the nurse that she should evaluate him

for housing in the SNU (Id.).

Accompanied by Sgt. Stoff and Deputy Weigert, Albritton approached Griffin to escort him

to Central County Jail ("CCJ") to cell #8 (Id. at p. 68).  When they opened the door, Griffin calmed

down and was compliant (Id.).  He was escorted in handcuffs but was otherwise unrestrained (Id. at

p. 68).  Griffin was transferred in a van to CCJ (Id. at p. 75; Dkt. 109-9 at pp. 5-6).  Griffin complied

with Albritton's orders to exit the van and walk with him to the jail (Dkt. 109-9 at p. 7).

When Griffin arrived at CCJ, Deputies Morgan and Lashley and Sergeants Reimer and

Montgomery were waiting (Id.).  Stoff had informed Reimer and Montgomery that Griffin had been

loud and disruptive at book-in and might pose a problem.  When Griffin arrived, he told them "so

long as you don't touch me, I'll do anything you say."  (Dkt. 87 at p. 9).  Griffin complied with

Reimer's orders, and was placed in a holding cell while the officers prepared paperwork (Dkt. 83 at p. 43).  Griffin's face was red, he was agitated, and sweating profusely (Id. at p. 44).

Griffin was placed in general population because he was not on medical or suicide watch. (Dkt. 87 at p. 32).  At approximately 4:30 that afternoon, approximately 30 to 45 minutes after Griffin was placed in general population (Dkt. 83 at pp. 42, 44-45), Reimer was alerted by Montgomery that Griffin had broken a broomstick and was waiving it at other inmates, trying to incite a fight (Dkt. 83 at p. 45).  Deputy Vasquez and two other deputies approached Griffin and ordered him to drop the broomstick, which he did (Id.).  Vasquez suggested to his sergeant that Griffin be placed in an isolation cell so that he couldn't hurt himself or anyone else (Id. at pp. 45-49).

When Vasquez ordered Griffin to leave with him,  Griffin told him "nobody touch me, I'll go on my own." (Id.).  Vasquez walked Griffin to the holding cage without incident and was placed in isolation  (Id. at pp. 56-57).  Vasquez did not think Griffin was having mental health problems but thought that he may have been high on drugs (Id. at p. 49).

Griffin began pacing back and forth, talking to himself, and hitting the cage (Id.).  He threw his bed mat and food on to the floor (Id. at pp. 61-62).  He did not sleep while in the isolation cell (Dkts. 109-5 at p. 4; 109-6 at p. 4).  He was hitting the glass window on his cell door.[6]  In his incident report, Reimer wrote "I recommend that the inmate receive a mental health evaluation before being released from isolation." (Dkt. 87 at p. 34).  He contacted the nurse and requested a mental health evaluation (Id. at p. 36-37; Dkt. 59).  Reimer had Deputy Morgan place an "Isolation Door Tag" on Griffin's cell door which noted that he was in isolation pending a mental health

---

[6] Whether the glass was cracked before Griffin was placed in the cell or cracked as a result of his actions is disputed (See Dkt. 82, pp. 78-79; Dkt. 109-6, pp. 4-5). The dispute is immaterial for purposes of summary judgment. It is undisputed that the window was cracked before Griffin was removed from his cell.

evaluation (Dkts. 59, 59-1, 63 at pp. 37-38).  Morgan also informed the nurse that Griffin needed a

mental health evaluation (Id.; Dkt. 63 at p. 37).  Griffin was placed in the isolation cell on the

afternoon of March 18, 2006, a Saturday (Dkt. 83 at p. 49).  A mental health counselor was not

available until the following Monday (Id.).  Griffin was scheduled for the evaluation that Monday

(Dkt. 66 at p. 82).[7]

At approximately 5:45 p.m. on Saturday afternoon, Sgt. Marcum arrived at CCJ (Dkt. 109-11

at p. 5).  Reimer informed Marcum that Griffin was in isolation because he had wielded the broken

mop handle in general population (Id.).  He also told her that while in isolation, Griffin had been

yelling, making threats, and was beating on the door (Id.).  At approximately  6:30 p.m., Marcum

went to Griffin's cell to observe him (Id. at p. 4).  Griffin was yelling, talking incoherently, beating

on the door, and sweating profusely (Id.).  Marcum, who had special needs training, thought Griffin

may have been mentally ill, but was not sure (Id.).  She decided to let him be because it did not

appear to be a danger to himself or others (Id).

The next morning, at approximately 5:45 a.m., Reimer and Montgomery went to Griffin's

cell to check on him, having received reports that Griffin had been kicking and beating on his cell

door  (Dkt. 87 at p. 40).  Griffin had a bed sheet around his face like a mask (Id.).  Griffin removed

the bed sheet several times, came up to the cell door and stated that if he was sent to court, "people

would be sorry."  (Id. at pp. 40-41).  Reimer determined that under the circumstances, Griffin should

not be sent to court for his initial appearance and cancelled it (Id. at p. 41).  That afternoon, Reimer

told Marcum that Griffin's first appearance had been cancelled because he had threatened them when

---

[7]  If Griffin's mental health continued to degenerate, the deputies who were required to observe inmates in isolation every 15 minutes could have notified their supervisor, who in turn could have notified the duty nurse (Dkt. 87 at p. 37). The nurse could have notified an RN in the infirmary, who could have called in a mental health counselor (Id.).

they approached to remove him from the cell (Dkt. 109-11 at p. 8).  Later, Deputy Dort was in the isolation area conducting medication rounds (Dkt. 70 at p. 21).  Inmate Missildine, in a different isolation cell, put his arms through the food flap and refused to remove them, preventing Dort from closing it (Id.).  At the time, Griffin was banging on his cell door (Id.).  Dort contacted his supervisors and reported that he was having problems in the isolation area (Id.).  Lt. Galloway, Marcum and several deputies responded (Dkts. 82 at p. 79; 109-11 at pp. 10-11).  While they were speaking to Missildine, Griffin was yelling, screaming, and hitting and kicking his cell door (Dkt. 82 at p. 79).  Griffin's eyes were bloodshot and bulging and he was sweating profusely (Dkt. 109-11 at p. 10).  Because the cell was in disarray and the cell window was broken, Lt. Galloway determined that it was dangerous to leave Griffin in the cell. (Dkt. 82 at p. 79).  He decided to remove Griffin, place him in a restraint chair, have him examined, and have the cell cleaned (Id. at pp. 85-86; Dkt. 109-11 at pp. 10-11; Dkt. 70 at p. 24; Dkt. 72 at p. 40).  Marcum attempted to talk to Griffin but he did not respond (Dkt. 79 at pp. 59-60).

Deputy Dupree ordered Griffin to face the wall and place his hands on it, which Griffin did (Dkt. 88 at p. 63).  Burgess entered the cell with an electronic shield , followed by Galloway, Marcum, Brown, Reed, Hodge, Mayhue, Dupree, Despirito, and Dort (Dkt. 92-2 at pp. 7-8).  According to inmate Missledine, when the officers entered the cell, Griffin was on his knees with his hands on the wall (Dkt. 93 at p. 70).[8]  The officers "bull dogged" Griffin to the right on to his stomach (Id. at p. 70-71).  The officers got on top of Griffin and he curled into the fetal position (Id.).

_____

[8]  As is evident from the various accounts of what transpired in the cell, whether Griffin remained on his knees as the deputies entered the cell or turned and charged Burgess, as Burgess described (Dkt. 88, p. 62-63), remains a disputed issue of material fact. For purposes of summary judgment, the facts are considered in a light most favorable to Plaintiff, the non-moving party. *Galvez v. Bruce*, *supra*.

Marcum put her foot on the side of Griffin's neck and pointed the pepper spray gun at his face (Id. at p. 72).

According to Missledine, as the officers were trying to cuff Griffin, Griffin was fighting back, kicking them as the officers tried to hold his feet and legs (Id. at p. 73). Reed put the electronic shield on Griffin's back, activated it and the officers cuffed Griffin's hands (Dkt. 69 at p. 26; Dkt. 93 at p. 73-74). Missledine counted eight charges from the shield, each lasting five to ten seconds, and testified that Griffin was cuffed before being charged  (Dkt. 93, pp. 74-75; Dkt. 109-6 at p. 6). After the shield was used, Griffin stopped fighting and leg shackles were applied (Id. at pp. 76-77). According to Missledine, Griffin was shocked again with the shield after he was handcuffed and shackled (Dkt. 93 at pp. 81-82, 91). Because of Griffin's size, two sets of handcuffs were used to ease the strain on his shoulders (Id.).

 Inmate Walters heard and saw an officer stomp on Griffin's back (Dkt. 109-6 at p. 6). After Griffin was lying still on the floor, all of the officers except Despirito and Marcum exited the cell (Dkt. 93 at pp. 80-84). After a few minutes, Marcum looked at Inmate Missledine, smirked, and giggled (Id. at pp. 84-85; 94-95). Marcum and Despirito rolled Griffin on his back (Id. at p. 86). Missledine could see that Griffin was not breathing and heard Despirito say "he ain't breathing." (Id. at pp. 86-87). Griffin's skin started to change color (Id. at p. 87). Marcum and Despirito walked out of the cell (Id. at p. 88).

Despirito and Dupree dragged Griffin by his legs to the nurse's station (Dkt. 73 at p. 56; Dkt. 72 at p. 54). Missledine could not see what happened at the nurse' station. (Dkts. 89 at pp. 89-90). When the nurse approached Griffin, he tried to kick her (Dkt. 72 at pp. 54-55; Dkt. 73 at pp. 68-69). Griffin began slamming his heels and head on the floor (Dkt. 72 at p. 55). Despirito tried to hold

Griffin's legs down (Dkt. 71 at p. 64). Mayhue put the electronic shield on Griffin's legs to hold them down and activated it (Id.). Griffin was rolled onto his side and Dupree attached a second set of shackles to Griffin's handcuffs and leg shackles. Griffin was rolled onto his back (Dkt. 72 at pp. 55-56).

At this point, Griffin became unresponsive and stopped breathing (Id.; Dkt. 66 at p. 77). The nurse was unable to find a pulse or and was unable to detect a heart beat using her stethoscope (Dkt. 66 at p. 77). Griffin was placed on the gurney and CPR was started (Dkt. 109-13 at p. 12). Defibrillator patches were attached but the defibrillator monitor indicated not to activate (Dkt. 92-2 at p. 9-10). EMS arrived at 9:05 p.m. and pronounced Griffin dead at 9:32 p.m. (Id.).

Dr. Vincent Di Maio, Defendants' forensic pathologist, concluded that Griffin died as the result of Excited Delirium Syndrome (Dkt. 103-1 at p. 6). He opined:

> The mechanism of death was sudden cardiac arrhythmia due to hyper-adrenergic state secondary to an episode of Excited Delirium acute psychotic episode complicating his schizophrenia the physiological effects of schizophrenia itself and his struggle with the deputies Mr Griffin would have been more susceptible to development of an arrhythmia due to mild enlargement of his heart. Contact with the electrified shield asphyxia and blunt trauma played no role in this death.

(Id.). Plaintiff's pathologist opined that Griffin died as a result of positional asphyxia (Dkt. 89 at p. 63). He opined that the "major factor in the positional asphyxia was basically the way he was restrained." (Id. at p. 64). His report indicated a cause of death as "ACUTE RESPIRATORY COMPENSATION AND PULMONARY EDEMA COMPLICATING BLUNT FORCE TRAUMA, POSITIONAL RESTRAINT, AND EXPOSURE TO ELECTRICAL RESTRAINT." (Dkt. 104-1 at pp. 4-5)

**Deliberate indifference:  Count IX**

Plaintiff alleges that Defendants were deliberately indifferent to Griffin's serious medical needs in violation of Griffin's Fourteenth Amendment due process rights by failing to provide appropriate medical care.  Defendants contend that they are entitled to summary judgment on their defense of qualified immunity.

Generally, "prison officials have an obligation to take action or to inform competent authorities once the officials have knowledge of a prisoner's need for medical or psychiatric care." *Waldrop*, 871 F.2d at 1036 (citation omitted).  The record demonstrates that this was done.  On Saturday, March 18, 2006, at approximately 1:00 p.m., Griffin arrived at CCJ (Dkt. 92-2 at p. 6). After he threatened other inmates with the broken broom handle at approximately 4:30 p.m., he was moved to an isolation cell.  Sgt. Reimer recommended a mental health evaluation in his report, informed the nurse that Griffin should receive a mental health evaluation, and had a sign posted on Griffin's cell indicating that a mental health evaluation was pending.

Reimer took appropriate action to protect Griffin by having him placed in an isolation cell and informing medical personnel that Griffin should receive an evaluation.  It was the nurse's responsibility to arrange the mental health evaluation (Dkt. 78 at p. 25).  Sgt. Marcum, who arrived at CCJ at approximately 5:45 p.m. on March 18, 2006 and remained on duty until approximately 6:00 a.m. on Sunday, March 19, 2006 (Dkt. 109-11 at p. 7).  Griffin was pacing in the cell, talking to himself, yelling, banging on the cell door and sweating, but there was no indication that he ever threatened or attempted to harm himself.  Although Marcum believed that Griffin may have been mentally ill, she determined to leave Griffin in his cell because he was not endangering himself or others (Id.).

When Griffin's behavior escalated, it was decided to remove him from his cell, place him in a restraint chair, have him examined by the nurse, and clean his cell (Dkt. 92-2 at p. 8). After the extraction fracas, he became unresponsive. At approximately 8:57 p.m., EMS was called (Dkt. 92-2 at p. 10). EMS arrived at approximately 9:05 p.m. and Griffin was pronounced dead at 9:32 p.m. (Id.). When he died, Griffin was at the nurse's station.

## Qualified Immunity

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 102 S. Ct. 2727, 2738 (1982)). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Crenshaw v. Lister*, 556 F.3d 1283, 1289 (11th Cir. 2009) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). "To receive qualified immunity, the officer must first show that he acted within his discretionary authority." *Lewis v. City of W. Palm Beach Fla.*, 561 F.3d 1288, 1291 (11th Cir. 2009).

It is undisputed that all Defendants were acting within the scope of their discretionary authority when Griffin was being booked and processed at PCJ and detained at the jail. The burden therefore shifts to Plaintiff to show that qualified immunity is not appropriate. *See id.* A qualified immunity analysis involves a two-part inquiry. First, do the facts establish a violation of a constitutional right? *Pearson*, 129 S. Ct. at 815-16. Second, was the right "clearly established" at the time the alleged wrong occurred? *Id.* at 816.

**Deliberate indifference to a serious medical need**

Due process requires jail officials to provide pretrial detainees basic medical care. *Gary v. Modena*, 2006 WL 3741364, 4 (11th Cir. 2006).   A jail official violates a pre-trial detainee's Fourteenth Amendment right to due process if the official acts with deliberate indifference to the detainee's serious medical needs. *Crosby v. Monroe Cty.*, 394 F.3d 1328, 1335 (11th Cir. 2004). "[P]rison officials have an obligation to take action or to inform competent authorities once the officials have knowledge of a prisoner's need for medical or psychiatric care. *See, e.g., Estelle*, 429 U.S. at 104-05, 97 S. Ct. at 291.  The failure to notify competent officials of an inmate's dangerous psychiatric state can constitute deliberate indifference. *See, e.g., Colburn v. Upper Darby Township*, 838 F.2d 663, 667-68 (3rd Cir. 1988); *Partridge v. Two Unknown Police Officers of Houston*, 791 F.2d 1182, 1186-87 (5th Cir. 1986); *Waldrop v. Evans*, 871 F.2d 1030, 1036 (11th Cir. 1989). Further, substantial and inordinate delay in treatment may raise a jury question as to a defendant's deliberate indifference to a detainee's serious medical need. deliberate indifference. *Farrow v. West*, 320 F.3d 1235, 1246-47 (11th Cir. 2003).

In *Youmans v. Gagnon*, 626 F.3d 557 (11th Cir. 2010), the Eleventh Circuit summarized deliberate indifference:

> To prevail on a claim of deliberate indifference to serious medical need in violation of the Fourteenth Amendment, a plaintiff must show: "(1) a serious medical need; (2) the defendant['s] deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009).

> "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* at 1307 (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)). FN 8  In general, serious medical needs are those "requiring immediate medical attention." *See Hill*, 40 F.3d at 1190.

To prove "deliberate indifference" to a serious medical need, a plaintiff must show "'(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence.'" *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010) (quoting *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005)).

> FN8 Serious medical need might alternatively be established where the condition worsens due to a delay. *See Mann*, 588 F.3d at 1307. Here, because Plaintiff does not contend further injury from the delay in treatment, the proper test is whether a lay person would easily recognize the need as serious. In addition, that a medical need might be recognizable by a trained medical professional, such as a nurse, is not enough. Instead, the need for immediate medical assistance must have been apparent to the untrained eye of a layperson. *See id.* at 1307-08.

*Id.* at 563-64.

**Defendants Albritton, Kemp, Stoff, and Wiegert**

Plaintiff contends that the record demonstrates that these Defendants, who booked and processed Griffin, knew that he had a history of mental illness for which he had been prescribed medication.[9]  She further asserts that Griffin was having an obvious medical and mental health crisis during booking, because while in the booking area, Griffin was loud, belligerent, aggressive, kicking and banging on the cell doors, stated that he saw God on a computer screen, was sweating and his skin was flushed and reddish.  She contends that Griffin exhibiting symptoms of "excited delirium syndrome," which should have been obvious to these officers, but that they did not insure that he was

---

[9] Contrary to Plaintiff's argument, the jail medical records do not detail a "diagnosis of bipolar and schizophrenia" (Dkt. 109, p. 2). Those records reflect that Griffin *self reported* a prior hospitalization for " a psychiatric problem" (Dkt. 109-1), that he was prescribed Abilify and Ativan (109-2; 109-4), and that he had been "*diagnosed Bi-Polar or some shit like that.*" (109-4)(emphasis added).  In September, 2004, a licensed practitioner conducted a screening and assessment of Griffin, identified "Schizophrenia-Paranoid Type" as a condition "that may be a Focus of Clinical Attention." She did not not make a definitive diagnosis, however.  Indeed, a later note indicated "no mental health problems" (Dkt. 109-3, p. 8).  Simply put, the record does not support Plaintiffs argument that these Defendants subjectively knew that Griffin had been diagnosed by a physician as bi-polar.

Also contrary to Plaintiff's argument, PCSO's Healthcare Nurse Administrator Karen Riley has not "admitted" that Griffin "suffered an acute psychological event at the jail" (Dkt. 109, p. 3).  Riley in fact expressly disclaimed any opinion about whether Griffin suffered such an event, explaining that she does not have a mental health background, was not a witness to any of Griffin's behavior, and was not qualified to render a diagnosis (Dkt. 78, pp. 72-73; 89-91). In her words, "Oh no, I can't tell you he did or didn't have one, I'm not a doctor, but based on what you're saying to me, he does have a problem with his behavior, yes." (Id. at p. 91).

provided with immediate medical treatment. [10]

Although notes at PCJ from Griffin's prior incarcerations indicate that he had self reported a prior hospitalization and treatment for a psychiatric problem, (Dkt. 109-2, 109-3, 109-4), those notes do not indicate that a *physician* had diagnosed Griffin with any particular psychiatric condition, "excited delirium syndrome" or otherwise. Nor does the record support Plaintiff's argument that it was obvious to the booking officers that Griffin was suffering a serious medical and mental health crisis at the time. A serious medical need is considered "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003).

Notwithstanding that his conduct and appearance may have been, from a medical practitioner's hind sight perspective, consistent with "excited delirium syndrome," the record does not demonstrate that it would have been obvious to these booking officers as lay persons that Griffin was suffering from such a condition or that he required medical attention. Simply put, his conduct was not such that "even a lay person would easily recognize the necessity for a doctor's attention." *Mann v. Taser Int'l Inc*, 588 F.3d at 1307. Accordingly, Defendants Albritton, Kemp, Stoff, and

---

[10] *See Mann v. Taser Int'l, Inc*., 588 F.3d 1299, 1307 (finding "excited delirium" presented a serious medical need):

Although not a validated diagnostic entity in either the International Classification of Diseases or the Diagnostic and Statistical Manual of Mental Disorders, "excited delirium" is a widely accepted entity in forensic pathology and is cited by medical examiners to explain the sudden in-custody deaths of individuals who are combative and in a highly agitated state. "Excited delirium" is broadly defined as a state of agitation, excitability, paranoia, aggression, and apparent immunity to pain, often associated with stimulant use and certain psychiatric disorders. The signs and symptoms typically ascribed to "excited delirium" include bizarre or violent behavior, hyperactivity, hyperthermia, confusion, great strength, sweating and removal of clothing, and imperviousness to pain. Speculation about triggering factors include sudden and intense activation of the sympathetic nervous system, with hyperthermia, and/or acidosis, which could trigger life-threatening arrhythmia in susceptible individuals. Carolyn B. Robinowitz, MD, REPORT OF THE COUNSEL ON SCIENCE AND PUBLIC HEALTH 453 (AMERICAN MEDICAL ASSOCIATION, ANNUAL MEETING 2009).

Wiegert could not have been deliberately indifferent to a non-existent or unrecognizable serious medical condition and are therefore entitled to summary judgment on Plaintiff's claim of deliberate indifference.

In support of her claim of deliberate indifference, Plaintiff must present evidence that these Defendants (1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; (3) by conduct that is more than gross negligence. *Townsend v. Jefferson Cty.*, 582 F.3d at 1258. A deliberate indifference analysis must typically assess a defendant's knowledge of the seriousness of the plaintiff's medical condition and his action, or inaction, in the face of such knowledge. *See, e.g., Lancaster v. Monroe Cty.*, 116 F.3d 1419, 1426 (11th Cir 1997), *overruled on other grounds, LeFrere v. Quezada*, 588 F.3d 1317, 1318 (11th Cir. 2009).

Plaintiff's expert, Tucker, indicates that as of January 30, 2006, the Polk County Sheriff's Office "had a General Order in place . . . that . . . discussed Excited Delirium Syndrome and the need to recognize the types of behavior associated with Excited Delirium Syndrome before there is a dangerous escalation of conflict . . . ." (Dkt. 91-1 at p. 7). He opined that in 2006, "law enforcement officers and detention deputies *typically* received training on bipolar disorder, dealing with emotionally disturbed persons and excited delirium syndrome. In Tucker's opinion, the PCSO detention deputies *should have been* aware of the fact that bipolar disorder is a severe form of mental illness . . . and excited delirium syndrome is considered a medical emergency . . . ." (Id.)(emphasis added).

Notwithstanding Tucker's opinions, the opinion of an expert does not create a material issue of fact as to whether these booking officers subjectively knew that a substantial risk of serious harm existed. *See Campbell v. Sikes*, 169 F.3d at 1370-71. Plaintiff presents no direct or circumstantial

-22-

evidence from which a jury could infer actual knowledge on the part of Albritton, Kemp, Stoff, and Wiegert that Griffin had a serious medical need, whether by diagnosis or because it was so obvious that they would have easily recognized the need for immediate medical attention.  Nor does Plaintiff produce direct or circumstantial evidence that these booking officers subjectively knew that there was a risk of serious harm to Griffin.

Plaintiff has not established that these officers had actual knowledge of or had been trained in bipolar disorders or excited delirium syndrome such that Griffin's conduct would have made it obvious to them that there was a risk of serious harm requiring immediate medical attention. Although the Polk County Sheriff's Office had a "General Order" discussing behaviors associated with "Excited Delirium Syndrome," that document "originated" approximately six weeks prior to Griffin's death and there is no evidence that these Defendants were aware of that document."[11]  In sum, Plaintiff presents no evidence, and therefore no genuine issue of material fact, that these Defendants disregarded a known risk of serious harm.

Likewise, nothing in the record suggests that these Defendants were aware that Griffin's mental illness could lead to death if not promptly treated.  While in booking, Griffin was loud, belligerent, verbally aggressive, kicking and banging on cell doors, and his skin was flush and reddish.  However, when he was not in a cell, Griffin was calm, polite, cooperative, and engaged in small talk with Albritton.  Further, these Defendants took the precautionary measure of placing Griffin alone in a padded cell to avoid harm to him.  Significantly, Albritton escorted Griffin to a nurse for a health screening and suggested that she consider evaluating Griffin for placement in the

---

[11] Even if Defendants were aware of the General Order and failed to comply, that "failure is not a per se constitutional violation." *Meier v. County of Presque Isle*, 376 Fed. Appx. 524, 529 (6th Cir. Mich. 2010) (unpublished opinion).

SNU, a determination only medical personnel were authorized to make (Dkt. 86 at pp. 11-12). Whatever her reasons, the nurse determined that Griffin was suitable for general population (Dkt. 58). Griffin cooperated with Albritton as he was transported to CCJ. When Albritton left CCJ, Griffin was in the custody of officers at that facility.

Under these circumstances, Defendants Albritton, Kemp, Stoff, and Wiegert were not deliberately indifferent to a serious medical need. Accordingly, they did not violate Griffin's Fourteenth Amendment rights and are therefore entitled to summary judgment on Count IX.

### Clearly established right

Plaintiff has likewise failed to carry her burden of showing that the claimed right was clearly established at the time of the incident. "A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291-92 (11th Cir. 2009) (internal citations omitted). Judicial decisions relevant to the determination of clearly established law are those of the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the Florida Supreme Court. *See Jenkins by Hall v. Talladega City Bd. of Educ.*, 115 F.3d 821, 827 n.4 (11th Cir.1997) (en banc).

None of the cases Plaintiff cites contain "indistinguishable facts clearly establishing the constitutional right." While there need not be a case "on all fours" with the challenged conduct, there must at least be a broad principle of law that applies with "obvious clarity." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1277 (11th Cir. 2004). The pertinent question is whether the

controlling law at the time of the incident gave these Defendants fair and clear warning that their alleged conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Plaintiff proposes a broad principle that a prison official acts with deliberate indifference "by delaying the treatment of serious medical needs." *McElligott v. Foley*, 183 F.3d 1248, 1255 (11th Cir. 1999). While generally, that principle accurately states the law, it does not apply with "obvious clarity" to these booking officers. Cases involving deliberate indifference claims based on a delay in medical treatment require a "highly fact-specific inquiry." *Bozeman v. Orum*, 422 F.3d 1265, 1274 (11th Cir. 2005). Here, no inference can be drawn from the evidence that theses officers subjectively knew that Griffin was in need of immediate medical care and that a delay would expose him to substantial risk of serious harm. Accordingly, they are entitled to summary judgment on Plaintiff's claim of deliberate indifference to a serious medical need as alleged in Count IX.

### Defendants Vasquez and Reimer

Plaintiff contends that Defendants Vasquez and Reimer violated Griffin's Fourteenth Amendment rights through deliberate indifference to Griffin's serious medical needs, by failing to obtain medical treatment for him. These Defendants also argue that they are entitled to summary judgment on their defense of qualified immunity.

To prove "deliberate indifference" to a serious medical need, a plaintiff must show "'(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence.'" *Townsend v. Jefferson Cnty.*, *supra*, quoting *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005).

Like the booking officers, Defendants Vasquez and Reimer are entitled to qualified immunity. First, there was no precedent putting them on notice that their actions or inactions were

clearly unconstitutional.   Second, there is no evidence that these Defendants were deliberately indifferent to an objectively serious medical condition.  Notwithstanding the behavior Vasquez and Reimer observed, Plaintiff presents no direct or circumstantial evidence that Vasquez and Rimes had actual knowledge of the condition "excited delirium" or that they were subjectively aware of a serious risk of harm that a delay in treatment for "excited delirium" could cause Griffin, or, for that matter, his claim of being bi-polar.  Moreover, these Defendants did not disregard any perceived risk of harm to Griffin.

Vasquez monitored Griffin during his shifts.  He recalled that they had been notified that Griffin had some problems in booking "and was acting up." (Dkt. 83, p. 41).  When he first saw Griffin in the housing unit, Griffin was "agitated," "sweating profusely," and his face was "real red." (Id. at p. 44).  Vasquez talked to Griffin who told him, "Nobody touch me, I'll be okay."  Vasquez took that as indicating that Griffin would in fact be okay.  He thought Griffin's appearance was a result of the problems he had in booking. (Id.).   By then, Griffin had "already seen a nurse in booking."  As Vasquez explained "if there is not a problem or he's not causing any type of problem, he's going to go directly into the general population area." (Id. at p. 44).

About "30, 45 minutes" after Griffin was placed in general population, he threatened other inmates with a broken broom handle.  Vasquez confronted Griffin, who complied with Vasquez' order to drop the broomstick handle.  Vasquez moved Griffin to an isolation cell for his safety. Vasquez believed Griffin may have been high on drugs.  "We walk him to the cage . . . and he was acting real high like he was on, I don't know, I would say drugs or stuff like that, but he was pacing back and forth in the cage and hitting the cage." (Id. at p. 45).  Griffin was talking to himself and mumbling but Vasquez could not understand him (Id. at pp. 45-46).

First, Griffin's appearance and conduct was not such that "even a lay person would easily recognize the necessity for a doctor's attention." Significantly, Vasquez did not perceive a serious medical need. As such, Vasquez could not have been deliberately indifferent to an unrecognizable "serious medical need," that is, one that required "immediate medical attention." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d at 1187. Vasquez acknowledged that Griffin's behavior was not normal and it escalated. "His behavior told me there was something wrong with him." (Id. at 49, 51). Vasquez was trained in dealing with inmates with mental health problems and was trained in the use of the SNU unit. He thought, however, based on his experience, that Griffin was high on drugs, rather than having mental health problems (Id.). As Vasquez puts it, "And yes, he was agitated, he was acting way out of the ordinary, but he had complied with my orders at one point, so I approached him and talked to him again, he complied." (Id. at p. 48). Vasquez recommended to Reimer that Griffin be placed in a one man isolation cell for his safety, an objectively reasonable response to Griffin's behavior (Id. at p. 49).

Second, at most, considering his training, Vasquez's actions were arguably inadequate or negligent, but not objectively insufficient. "Deliberate indifference" entails more than mere negligence. *Townsend v. Jefferson Cnty.*, 601 F.3d at 1158; *Farrow v. West*, 320 F.3d at 1245. A prison official cannot be found deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1970). In other words, a defendant must be shown to have had subjective awareness of an "objectively serious need" and his response must have been "an objectively insufficient response to that need"). *Farrow v. West* 320 F.3d 1235, 1245-46

(11th Cir. 2003)(citing *Taylor v. Adams*, 221 F.3d at 1254, 1258 (11th Cir. 2000)).

As for Reimer, Plaintiff acknowledges that as a result of Griffin's behavior, Reimer documented in his incident report his recommendation that Griffin receive a mental health evaluation. Reimer placed Griffin in isolation for his own protection, informed the nurse that Griffin should be scheduled for a mental health examination and directed that a sign be posted on Griffin's cell indicating that a mental health evaluation was pending. These actions certainly belie Plaintiff's claim that Reimer deliberately disregarded a perceived risk of harm to Griffin. Reimer's response was objectively reasonable under the circumstances.

To establish deliberate indifference, Plaintiff must establish four requirements: (1) an objectively serious need; (2) an objectively insufficient response to that need; (3) subjective awareness of facts signaling the need; and (4) an actual inference of required action from those facts. *Taylor v. Adams*, 221 F.3d at 1258. In sum, although it can be inferred that these Defendants subjectively recognized that Griffin was experiencing mental health issues and that they were perceived to have been sufficiently serious to warrant an evaluation, they took objectively appropriate action to safeguard him from injury and referred him for a mental health evaluation. There is no evidence, direct or circumstantial, from which to infer that these Defendants were aware that a delay in obtaining the evaluation would expose Griffin to a "substantial risk of serious harm." *Taylor v. Adams*, 221 F.3d at 1258. Certainly, Plaintiff has not presented evidence of an "attitude of 'deliberate indifference'" on the part of these two Defendants. *Id.* Accordingly, there was no constitutional violation and Defendants Vasquez and Reimer are entitled to summary judgment on Plaintiff's claim of deliberate indifference in Count IX.

**Defendants Galloway, Marcum, Brown, Reed, Hodge, Mayhue, Dupree, Despirito, Burgess**

For the same reasons, these Defendants, collectively the "extraction officers," are likewise entitled to summary judgment on Plaintiff's claim of deliberate indifference to a serious medical need. There is nothing of record demonstrating that prior to Griffin's death, these Defendants received training on or otherwise knew how to recognize symptoms of excited delirium. Plaintiff presents no evidence, direct or circumstantial, demonstrating that these Defendants were subjectively aware of a risk of serious harm based on Griffin's conduct, that they disregarded that risk of harm, or that their responsive actions constituted more than negligence. Indeed, they were in the process of taking Griffin to see the nurse when he died.

As for all Defendants, a determinative and undisputed fact in this case is that these Defendants did not ignore Griffin's behavior but responded to it. In order to demonstrate deliberate indifference, Plaintiff must provide evidence not only that Griffin "presented an objectively serious medical need" but that the officers "ignored it." *Gary v. Modena*, *supra* at 4. Here, the undisputed evidence establishes that the officers took objectively reasonable and appropriate action to insure that Griffin was isolated to avoid harm to him and that the medical staff was made aware of Griffin's behavior. They recommended an evaluation and posted the pending evaluation on Griffin's cell door. Indeed, he was scheduled to be evaluated the following Monday. It cannot be said, therefore, that these officers "ignored" an objectively serious medical condition.

Plaintiff necessarily quarrels with the sufficiency of that response. While Plaintiff argues that the officers should have recommended that the evaluated be conducted earlier, "mere negligence or a mistake in judgment does not rise to the level of deliberate indifference." *Mann v. Taser Int'l, Inc.*,

-29-

588 F.3d at 1308.  Similarly, proof that a defendant should have perceived a risk, or that more should have been done, is insufficient. *Campbell v. Sikes,* 169 F.3d 1353, 1364 (11th Cir. 1999).  Moreover, an alleged unconstitutional delay in treatment of an obviously serious medical condition must be such that "it is apparent that delay would detrimentally exacerbate the medical problem." *Taylor v. Adams*, 221 F.3d at 1259.  Plaintiff has not made this showing from an objective perspective.  The conduct of these officers cannot be judged in hindsight from a physician's perspective, as Plaintiff seemingly urges.

As law enforcement officers, these Defendants cannot be expected to perceive from Griffin's appearance and behavior that he was experiencing a mental health crisis which subjected him to a serious risk of harm.  *See Belcher v. City of Foley, Alabama*, 30 F.3d 1390, 1399 (11th Cir. 1994). None of the Defendants are mental health professionals.  Nor have they been shown to have had any medical or mental health training or experience.  As lay persons who suspected but could not have subjectively known that Griffin's conduct was symptomatic of some underlying serious mental health condition, they did exactly what they objectively should have done, place him in a protective setting, recommend that he be evaluated, and ultimately attempt to remove him from his cell to see the nurse when his behavior escalated.  Under these circumstances, none of these Defendants are shown to have been deliberately indifferent to an objectively serious medical need.  There was no constitutional violation and these Defendants are entitled to summary judgment on Plaintiff's deliberate indifference claim.[12]

---

[12] In her response to Defendants' motion, Plaintiff "respectfully encourages the court to independently examine the reports, depositions, and other documentation filed in the record to learn of the other additional facts supporting Defendant's subjective knowledge and their total ignorance of Griffin's grave symptoms" (Dkt. 17). Plaintiff misunderstands the function of the court. The Court has no burden "to distill every potential argument that could be made based upon the materials before it on summary judgment. . . . Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resolution Trust*

**Excessive Force: Count X**

Plaintiff contends that Defendants used excessive force on Griffin when they extracted him from the isolation cell, used an electric shield multiple times, and hog-tied him at the nurse's station, in violation of Griffin's Fourteenth Amendment rights and his rights under the Florida Constitution. (Dkt. 40, p. 36).[13] The Fourteenth Amendment protects pretrial detainees from use of excessive force. *See Bell v. Wolfish*, 441 U.S. 520, 523 (1979).  In *Smith v. Vavoulis*, 373 Fed. Appx. 965 (11th Cir. 2010), the Eleventh Circuit stated:

> To establish a claim for excessive force, a plaintiff must establish both a subjective and objective component. Subjectively, a plaintiff "must prove that 'force was applied … maliciously and sadistically for the very purpose of causing harm.'" *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999) (quoting *Whitley v. Albers*, 475 U.S. 312, 320-21, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986)). In determining whether force was applied maliciously and sadistically for the very purpose of causing harm, courts look to five factors: "(1) the extent of injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them." *Campbell*, 169 F.3d at 1375 (internal quotation marks omitted). Objectively, a plaintiff must prove that a requisite amount of force was used against him. "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson v. McMillian*, 503 U.S. 1, 10, 112 S.Ct. 995, 1000, 117 L. Ed. 2d 156 (1992) (citation omitted).

*Id*. at 966.

---

Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir.), cert. denied, 516 U.S. 817 (1995). In opposing summary judgment, the onus is on Plaintiff  "to point to the specific portions of the proffered material which create[s] a material issue of fact," and the Court is not required to "search the record" fr an unidentified issue of material fact to support a claim. *Restigouche, Inc. v. Town of Jupiter*, 59 F.3d 1208, 1213 n. 5 (11th Cir. 1995); *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir.), *reh den.*, 285 Fed. Appx. 743 (11th Cir. 2008).

[13] Contrary to Defendants' argument, Plaintiff does not make a claim under the Eighth Amendment (See Dkt, 57. P. 39). Defendants do not raise the defense of qualified immunity to Count X in their summary judgment motion.

Deciding whether force was applied maliciously and sadistically to cause harm requires an evaluation of "the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992).

On Plaintiff's claim of excessive force with respect to Griffin's extraction, the facts considered in a light most favorable to Plaintiff demonstrate that prior to entering the cell, the officers ordered Griffin to face and put his hands on the wall. Griffin complied. When the officers entered the cell, Griffin was on his knees with his hands on the wall, according to a fellow detainee, Missledine.[14] Notwithstanding, according to Missledine, the officers threw Griffin to the right and on to his stomach, and got on top of him. He curled up into a fetal position. Sgt. Marcum put her foot on the side of Griffin's neck and pointed the pepper spray gun at his face. An electronic shield was placed against Griffin's back and activated. The officers were on his back trying to hold his feet and legs. He was cuffed but kicked and fought. The officers applied the electric shield eight to ten times according to inmate Missledine. One officer stomped on Griffin's back and he was shocked with the shield after he was handcuffed and shackled. Griffin sustained blunt force trauma to his head, extremities, thorax and abdomen.

In a light most favorable to the non-moving party, notwithstanding that some force was justified to restrain Griffin after he started fighting the officers, these facts are sufficient to raise a material issue of fact as to whether the force used was excessive. *See Council v. Sutton,* 366 Fed.

---

[14] The officers testified to a markedly different version of the events. According to them, when they opened the cell door, Griffin put his hands on the wall as instructed. When Deputy Burgess entered, he told Griffin to kneel to be cuffed but Griffin turned and charged at Burgess, hitting Burgess in the back, taking him and Sgt. Brown down (Dkt. 88, pp. 46; 63-65).

Appx. 31 (11th Cir. 2010)(where prisoner claimed he already on his knees with his hands in the air before defendants entered his cell and remained so while defendants used a taser on him repeatedly and shot him with bean bag rounds, use of force was excessive).  Likewise, the use of the electronic shield on Griffin after he was handcuffed, shackled and had stopped resisting supports Plaintiff's claim of excessive force, at least to the extent of raising material issues of fact as to whether the use of the shield was to "maliciously and sadistically cause harm." *See Hadley v. Gutierrez*, 526 F.3d 1324, 1333-34 (11th Cir.2008) ("[A] handcuffed, non-resisting defendant's right to be free from excessive force was clearly established in February 2002.").

Griffin sustained severe injury as a result of the force which caused or contributed to his death.  The record does not indicate that the officers made any effort to temper the severity of their forceful response or attempted a less forceful extraction, such as ordering Griffin to put his hands through the food flap for handcuffing or otherwise voluntarily submit to handcuffing, as suggested by Defense expert DeLand (Dkt.  92, pp. 180-81; 192).  Griffin had previously complied with orders to exit or enter a cell.  A jury could find that the use of an electronic shield and 10 officers to physically extract Griffin under these circumstances was excessive, if it finds that he did not resist initially.

Plaintiff also contends that Defendants used excessive force when they "hog-tied" Griffin at the nurse's station.  The facts in the light most favorable to Plaintiff are that Griffin was dragged by his legs from the isolation cell to the nurse's station.  Griffin was  lying on the floor handcuffed and shackled.  According to detainee Christopher Claesson, Griffin appeared to be unconscious and the officers slapped him to wake him up.  When the nurse approached Griffin, he tried to kick her.  Griffin began slamming his heels and head onto the floor.  One officer used the electronic shield to

hold down Griffin's legs and activated it.  Griffin was rolled on to his side and another officer attached a second set of shackles between Griffin's handcuffs and leg shackles.  Griffin was rolled onto his back but became unresponsive, stopped breathing, and subsequently died.  According to Plaintiff's medical expert, the cause of Griffin's death was positional asphyxia and the "major factor in the positional asphyxia was basically the way [Griffin] was restrained."

In *Garrett v. Athens-Clarke County, Ga.,* 378 F.3d 1274 (11th Cir. 2004), analyzing the excessive force claim under the Eighth Amendment, the court found no excessive force was used where an arrestee died of positional asphyxia due to being fettered.  His ankles were tied together, his hands cuffed together behind his back, and his hands and feet were strapped together so that the distance between his wrists and ankles was fewer than 12 inches, causing his body to be bowed. *Id*. at 1278, 1280.  In *Garrett*, however, the court noted "in our review of the expert medical testimony in this case, we have found no statement quantifying -- or even attempting to quantify --the risk of death posed by fettering." *Id*. at 1280.  Here, Plaintiff's experts have quantified the risks associated with "hog-tying."  Further, although Deputy Dupree stated that Griffin was not hog-tied (Dkt. 72 at p. 57), Deputy Galloway referred to the restraint as "hog tie" (Dkt. 109-13 at p. 12).  Officers at the Polk County Sheriff's Office knew that they should not hog-tie a prisoner because it could cause breathing difficulties (Dkt. 79 at p. 44).

In sum, on Plaintiff's excessive force claim against Galloway, Brown, Marcum, Mayhue, Burgess, Dort, Reed, Hodge, Despirito and Dupree, genuine issues of material fact exist regarding whether the amount of force used was disproportionate to the need and whether the force was "maliciously and sadistically" used to harm Griffin.  Accordingly, Defendants' summary judgment motion is due to be denied on Plaintiff's excessive force claim in Count X.

**Assault and Battery Claims: Counts IV, VI**

Plaintiff's state law claims for assault and battery are predicated on the same facts, events and circumstances as her federal excessive force claim. The disputed issues of material fact that preclude summary judgment on her federal excessive force claim likewise prelude summary judgment on the state law assault and battery claims. Accordingly, the motion as to Counts IV and VI is due to be denied.

### Sheriff Judd's Motion for Summary Judgment: Counts I, II, III, V, VII, VIII, XI Negligent Hiring, Training, Supervision, and Retention: Count I Undertaker Doctrine (Count XI)

Plaintiff asserts state law negligence claims against Sheriff Judd based on his alleged negligent hiring, training, retention and supervision of his deputies. Plaintiff also asserts that Judd's failure to properly train his employees exposed Griffin to a "higher zone of risk." Sheriff Judd moves for summary judgment, arguing: 1) since he has conceded that all the employees were acting within the scope of their employment, and that he is vicariously liable for their negligence, there is no further claim against him for his own active negligence; and 2) Under Florida law, he is presumed not to have been negligent in hiring his employees because each employee was subjected to a strict background investigation before being hired and Plaintiff has not rebutted the presumption since Plaintiff's expert, Tucker, had no opinions relating to negligent hiring.

In Florida, where "a plaintiff alleges and a defendant admits that the alleged torts took place during the course and scope of employment, employer liability can *only* be pursued on the basis of respondeat superior and not on the basis that the employer was negligent." *Delaurentos v. Peguero*, 47 So. 3d 879, 882 (Fla. 3d DCA 2010) (citing *Mallory v. O'Neil*, 69 So. 2d 313, 315 (Fla.1954)) (emphasis added). Because Judd concedes that all of the conduct complained of took place during

the course and scope of the officer's employment (see Dkt. 42 at pp. 4-7), "the only allowable theory of liability against [Sheriff Judd] is respondeat superior." *Delaurentos*, 47 So. 3d at 882. Accordingly, Defendant Judd is entitled to summary judgment on Plaintiff's negligence claim in Count I and her claim under Florida's Undertaker Doctrine in Count XI.

**Vicarious Liability: Count II**

Asserting state law claims in Count II, Plaintiff contends that Sheriff Judd is vicariously liable for the negligent acts of his employees, alleging that the employees "had a duty to act prudently and reasonably in a manner in which they treated [Griffin] and they breached said duty when they used excessive force against [Griffin] and failed to refer him for medical care." (Dkt. 40 at p. 24). Judd argues that "there is no such thing as a 'negligent' excessive force claim." (Dkt. 57 at p. 30). He also argues that he is not vicariously liable for any negligence associated with failing to refer Griffin for medical care because his employees fulfilled their duty when Sgt. Reimer and Deputy Morgan requested a mental health evaluation for Griffin from the nurse and placed a sign on Griffin's cell door indicating that a mental health evaluation was pending.

"The Florida courts have consistently and unambiguously held that 'it is not possible to have a cause of action for negligent use of excessive force because there is no such thing as the negligent commission of an intentional tort.'" *Secondo v. Campbell*, 327 Fed. Appx. 126, 131 (11th Cir. 2009) (quoting *City of Miami v. Sanders*, 672 So. 2d 46, 48 (Fla. 3d DCA), *rev. den.,* 683 So. 2d 484 (Fla. 1996)). *See also, Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1294 (11th Cir. 2009) ("[I]t is inapposite to allege the negligent commission of an intentional tort, such as the use of excessive force."). Accordingly, Sheriff Judd's Motion for Summary Judgment is due to be granted to the extent that Count II seeks to hold Judd vicariously liable for his employees' allegedly negligent use of excessive force.

-36-

With respect to Plaintiff's claim that Sheriff Judd is vicariously liable for his employees' failure to refer Griffin for medical care, "corrections officers have a duty to use reasonable care to insure the safety of inmates during their incarceration." *Ferguson v. Perry*, 593 So. 2d 273, 277 (Fla. 5th DCA 1992) (citation omitted).  This includes a "duty to render medical treatment[.]"  *Id.*  "The alleged negligent failure to comply with the duty to provide medical care to [a prisoner] is an operational level activity for which the sheriff is not immune from suit."  *Id.* at 278 (citation omitted).  Notwithstanding, a prison official "will seldom be required to do more than give such first aid as he reasonably can, and take reasonable steps to turn the sick [person] over to a physician, or to those who will look after [the person] and see that medical assistance is obtained." *Nobles v. Corrections Corp. of Am.*, 327 Fed. Appx. 838, 840 (11th Cir. 2009) (unpublished opinion) (quoting *Ferguson v. Perry*, 593 So. 2d at 277 n.5).

Nurse Riley, the health services administrator for PCJ at the time of Griffin's death,[15] testified in her deposition that because Griffin had informed the intake nurse that he had a mental illness, and because Griffin was "acting out," she believed the nurse should have called the Mental Health Professional Derek Zimmerman (Dkt. 78 at pp. 49-51).[16]  Tucker testified in his deposition that the deputies should have recognized that Griffin was experiencing a medical emergency, recognized that Griffin's condition was deteriorating, and gone back to medical to insist that Griffin be examined (Dkt. 91 at pp. 70-72).

Whether the Sheriff's employees were negligent in failing to take further action to obtain medical attention for Griffin is a jury question.  *See Ferguson*, 593 So. 2d at 277.  *See also, L.A.*

---

[15] Karen Riley's first day at PCJ was March 17, 2006, two days before Griffin's death (Dkt. 78 at p. 6).

[16] Zimmerman performed mental health assessments on prisoners (Dkt. 78 at p. 51).

*Fitness Int'l, LLC v. Mayer*, 980 So. 2d 550, 557 (Fla. 4th DCA 2008) ("the issue of whether a defendant exercised reasonable care is generally a jury question").  Genuine issues of material fact remain on this claim. Accordingly, Sheriff Judd's Motion for Summary Judgment is due to be denied as to Plaintiff's claim that he is vicariously liable for his employees' failure to obtain medical care for Griffin.

### Assault and Battery Claims: Counts III, V

Plaintiff asserts that Sheriff Judd is vicariously liable for the officers' assault and battery on Griffin.  Sheriff Judd argues that he cannot be vicariously liable because the officers are not liable for assault and battery, since there is no evidence that they intended to harm Griffin.  He further argues that there is no evidence that trauma or the electronic shield caused Griffin's death, and no evidence that the "hog-tying" was anything but negligence.

> Under Florida law, battery consists of (1) an act intended to cause a harmful or offensive contact to another person and (2) as a direct or indirect result of such action, an offensive contact with another person. *See Geidel v. City of Bradenton Beach*, 56 F. Supp. 2d 1359, 1367 (M.D. Fla. 1999) (citing *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. Ct. App. 1996). An assault consists of an intentional, unlawful offer of corporal injury to another by force, or an exertion of force directed toward another under such circumstances as to create a reasonable fear of imminent peril. *See Lay v. Kremer*, 411 So.2d 1347 (Fla. Ct. App. 1982).

*Duran v. City of Satellite Beach*, 2005 U.S. Dist. LEXIS 41795, at *10 (M.D. Fla. 2005). As this Court determined, *supra*, disputed issues of material fact preclude summary judgment on Plaintiff's federal excessive force claim and likewise prelude summary judgment on Plaintiff's state law assault and battery claims.

Florida law allows for the imposition of vicarious liability on a governmental entity for the intentional torts of its employee where the tort is committed within the scope of employment. Fla.

Stat. § 768.28(1) (2006); *Lawrence v. Dunbar*, 919 F.2d 1525,1528 (11th Cir. 1990). Sheriff Judd concedes that all his employees' acts were committed within the scope of their employment. Accordingly, he is not entitled to summary judgment on Counts III and V.

**Deliberate Indifference to Serious Medical Need: Count VII**

Plaintiff asserts that the officers' deliberate indifference to Griffin's serious medical needs was the result of the Sheriff's custom or policy not to refer prisoners for medical care, and seeks to impose supervisory liability on Sheriff Judd pursuant to § 1983 in Count VII. However, it has been determined, *supra*, that the officers were not deliberately indifferent to a serious medical need. Without an underlying constitutional deprivation, Sheriff Judd cannot be liable on the ground that his custom or policy caused a constitutional violation. *Gish v. Thomas*, 516 F.3d 952, 955 (11th Cir.2008); *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996), *cert. denied*, 522 U.S. 966 (1997). Accordingly, Sheriff Judd is entitled to summary judgment on Count VII.

**Excessive Force: Count VIII**

In Count XIII, Plaintiff alleges that Sheriff Judd violated Griffin's Fourteenth Amendment rights because use of excessive force by his deputies "are a part of a larger pattern of excessive force committed by the Sheriff of Polk County and his employees which amounts to a custom or policy by the PCSO resulting in numerous incidents of constitutional deprivation and amount to deliberate indifference of his rights." (Dkt. 40, p. 33). Plaintiff alleges that the deputies were inadequately trained and that Judd "failed to discipline them for their misconduct." (Id. at ¶ 87). Sheriff Judd moves for summary judgment, arguing: (1) excessive force was not used on Griffin, and (2) Plaintiff has presented no evidence of a widespread history of similar incidents that would support the claimed custom and policy.

Sheriff Judd is not entitled to summary judgment based on his argument that the deputies did not use excessive force on Griffin, since, as has been determined, there are disputed issues of material fact on Plaintiff's federal excessive force claim which preclude summary judgment. However, to impose liability on Judd in his official capacity on this claim, Plaintiff must show that the deprivation of a constitutional right resulted from: "(1) an action taken or policy made by an official responsible for making final policy in that area of the [Sheriff's] business; or (2) a practice or custom that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker." *Church v. City of Huntsville*, 30 F.3d 1332, 1343 (11th Cir. 1994).

There is no evidence in this record that a formal policy existed within the Polk County Sheriff's Office which encouraged the use of excessive force. To prevail on this claim, therefore, Plaintiff must provide evidence of a widespread custom or practice of using excessive force, that is, one "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.* She has not done so, as her evidence falls woefully short of establishing such a policy.

In support of her claim, Plaintiff asserts that several of the Defendants admitted that prior complaints of excessive force had been lodged against them. Specifically, Plaintiff asserts that Defendant Burgess was investigated for use of excessive force, Defendant Stoff had an excessive force claim lodged against him, and in 1998, Defendant Reimer slapped an inmate who was handcuffed (Dkt. 109 at p. 38). These incidents do not constitute a custom or practice tantamount to a functional equivalent to a policy adopted by Judd.

The claim against Defendant Burgess, which was actually a claim involving another officer who allegedly punched a prisoner while Burgess was escorting the prisoner, was determined to be unfounded as to both Burgess and the other officer (Dkt. 88 at pp. 87-89). Moreover, there is no

indication whether the claim against Burgess and the other officer occurred prior to Griffin's death (Id.). The claim against Defendant Stoff, which was alleged that he improperly used pepper spray on a prisoner, was also determined to be unfounded (Dkt. 86 at pp. 25-27). Moreover, this claim occurred before Judd became Sheriff (Id. at p. 26). Similarly, Defendant Reimer's discipline for slapping an inmate who was handcuffed and shackled occurred in 1998, before Judd became Sheriff (Dkt. 87 at pp. 46-47).

Plaintiff also identifies several allegations against a number of Defendants that occurred outside the scope of Defendants' employment with the Polk County Sheriff's Office (Dkt. 109 at p. 38). These include a claim of battery against Defendant Despirito by his girlfriend, a claim that Defendant Dupree placed her hands on a student at a school, a claim that Defendant Wiegert pushed an inmate at a juvenile boot camp, and Deputy Burgess' two arrests prior to his employment with the Polk County Sheriff's Office (Id.). Plaintiff also identifies a few incidents for which Defendant Reimer was disciplined that have nothing to do with the use of force (Id.). None of these incidents is factually similar to the Griffin's incident. *See Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005) (finding no municipal liability where plaintiff could not show that any other complaints of excessive force involved factual situations that were substantially similar to the plaintiff's incident).

Plaintiff's expert Melvin Tucker identified two incidents of alleged use of excessive force at the Polk County Jail in support of his opinion that a pattern of excessive force existed at the jail. However, the first (Culleton) occurred in 1994 under a predecessor Sheriff and resulted in the offending deputies being terminated (Dkt. 91, p. 97-100). The second (Rogers) allegedly occurred in 2004. That claim of excessive force resulted in a lawsuit and jury trial, and a verdict in favor of

the Sheriff (Dkt. 91 at pp. 97-105; Dkt. 91-1 at p. 11).  Tucker also mentioned 13 deaths of inmates at the Polk County Jail between 2000 and 2006  (Dkt. 91-1 at p. 11).  However, Tucker could not provide any information as to the cause of those deaths (Id.). None of this information supports Plaintiff's claim of a policy or pattern of excessive force.

Plaintiff asserts that Inmate Missildine claims that he was subjected to excessive force by Defendants Reimer, Mayhue and Burgess on March 19, 2006, the same day Griffin died (Dkt. 109 at p. 40). Plaintiff, however, does not assert whether Inmate Missildine's claim was determined to be meritorious.  Missledine's unsupported contention of an act occurring on the very day Griffin dies does not constitute evidence of a widespread custom or practice of using excessive force

In sum, Plaintiff has identified 5 instances of alleged excessive force against various officers while in the scope of their employment at the Polk County Sheriff's Office between 1998 and 2006, an average of less than one complaint per year.  Only one of those complaints (Reimer slapping a restrained prisoner) was found to have merit.[17] This evidence does not even raise a disputed issue of fact as to whether a pervasive, widespread custom or practice of using excessive force existed within the Polk County Sheriff's Office.  No such policy is shown to have existed.

That unsubstantiated complaints have been made is not evidence of widespread abuses.  Nor is one substantiated claim of unnecessary force, Reimer's slapping of the restrained prisoner, over a nine year time frame evidence of widespread abuse.  *See Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1294 (11th Cir. 2004) ("Our precedents are clear that, for constitutional violations to be sufficiently 'widespread' for a governmental supervisor to be held liable, they need occur with frequency"); *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir.1986)("A failure to stop

[17] Reimer was suspended without pay for his actions (Dkt. 87 at pp. 46-47).

mere isolated incidents cannot be deemed tacit approval: 'random or isolated incidents are insufficient to establish a custom or policy.'"). Moreover, this single substantiated complaint does not involve a factual situation substantially similar to this case. *See Mercado v. City of Orlando*, 407 F.3d at 1162.

A plaintiff may, by demonstrating a failure to correct constitutionally offensive actions, establish a custom or policy through deliberate indifference or tacit approval. *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987). The plaintiff must present evidence that the official was aware of the past misconduct and that a pervasive practice of constitutional violations. Church v. City of Huntsville 30 F.3d at 1345. In an attempt to support her contention that Sheriff Judd endorsed as a matter of policy the use of excessive force, Plaintiff alleges that he was deliberately indifferent to the use of excessive force (Dkt. 40, ¶ 86; Dkt. 109, pp. 29-31).

Plaintiff argues that the moving force behind the officers' use of excessive force was a policy of failing to investigate claims of excessive force, failing to discipline the improper use of force, and his failing to insure that his deputies were properly trained.[18] Specifically, she asserts that Judd failed to adequately investigate the circumstances surrounding Griffin's death and Missildine's claim that he was threatened by several Defendants prior to providing his statement to the investigator. Plaintiff argues that Defendant Mayhue was never disciplined for initially reporting that he did not use the electronic shield on Griffin in the nurse's station and that Defendant Galloway was never disciplined for telling the investigator that no weapons were used in the nurse's station.

---

[18] For the same reasons Plaintiff cannot prevail on her claim against Judd for supervisory liability for deliberate indifference to a serious medical need, she likewise cannot prevail on her claim of supervisory liability based on inadequate training in the area of excited delirium and bipolar disorder. *Gish v. Thomas*, 516 F.3d at 955 (absent underlying constitutional deprivation, no basis for supervisory liability).

Finally, she asserts that the Sheriff's Office inadequately investigated the 2004 excessive force claim that Tucker identified as having been tried, and which resulted in a verdict in favor of the Sheriff. She contends that the Sheriff's Office "quickly and dismissively" rejected Nurse Ventura's statement that deputies maced a prisoner and smashed his head into a wall while he was handcuffed (Dkt. 109 at p. 31).

These incidents do not support Plaintiff's claim against Sheriff Judd in Count VIII. They do not demonstrate a pervasive failure to correct constitutional deprivations nor do they establish that Judd tacitly approved of constitutional deprivations. Whatever the extent of the investigation into the allegation which resulted in the civil lawsuit and trial from the 2004 incident, the jury determined that no excessive force was used and that one instance, even if it was not properly investigated (and there is no evidence that it was not), does not demonstrate a pervasive pattern or policy .

Moreover, it is apparent from the record that the incident involving Griffin was extensively investigated. The Sheriff's Office conducted a homicide investigation during which Detective Brigman interviewed and took sworn statements from the officers involved and the inmates who witnessed the events. With respect to Missildine's deposition testimony that some of the detention deputies threatened him before he gave his statement, there is no indication that he ever informed Sheriff's Office officials that he was threatened. While he did seemingly indicate that detention deputies had threatened him, he declined to identify them (Dkt. 109-7 at p. 16). This unsupported accusation provides little support for Plaintiff's claim in Count VIII, and certainly does not demonstrate a pervasive pattern or policy of not investigating complaints through either deliberate indifference or tacit approval.

-44-

With regard to Plaintiff's contention that Defendants Mayhue and Galloway were never disciplined, Defendant Mayhue indicated that there were so many things going on during the incident that he simply did not remember that he had activated the electronic shield while he was attempting to stop Griffin from kicking his legs (Dkt. 109-20 at pp. 2-3).  Defendant Galloway told the investigator that no weapons were used on Griffin in the nurse's station (Dkt. 109-13 at p. 11).  At his deposition, Defendant Galloway stated that he did not see anyone use a weapon in the nurse's station (Dkt. 82 at p. 58).  These statements were not inconsistent.  The failure to discipline one officer who purported to have a memory lapse and another who made an inconsistent statement is not enough to establish a custom or policy endorsing the use of excessive force.  Finally, when Reimer used excessive force by slapping a restrained prisoner, the Sheriff's Office suspended him without pay.  In the light most favorable to Plaintiff, there is no support for the argument that Sheriff Judd was deliberately indifferent or misconduct or had a custom or policy of failing to investigate claims of excessive use of force.

Plaintiff next contends that Sheriff Judd had a policy that allowed and encouraged illegal and uncertified use of the electronic shield (Dkt. 109, p. 34).  The Sheriff's Office written policy required deputies to complete training before using the electronic shield and to obtain re-certification every twelve months.  When the electric shield was used on Griffin, Defendants Mayhue and Burgess' certifications lapsed.  Neither Defendants Mayhue, Burgess or their supervisors were disciplined for their use of the shield on Griffin.  Thus, Plaintiff argues that the failure to discipline these officers establishes that Sheriff Judd ratified an unwritten policy that allowed and encouraged uncertified use

of the electronic shield by officers.[19]   This one incident is not enough, however, to establish a "persistent and wide-spread practice" allowing and encouraging deputies to use the electronic shield without training or re-certification. *See Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994).

Likewise, Plaintiff fails to present evidence that there was a "persistent and wide-spread practice" of hog-tying prisoners.  Sergeants Reimer and Marcum testified that the officers at the Polk County Sheriff's Office do not hog-tie prisoners (Dkt. 79 at pp. 44-45; Dkt. 87 at pp. 29-31).  Deputy Dupree and Sgt. Marcum both testified that the method of restraint Dupree used on Griffin, attaching shackles between Griffin's handcuffs and ankle shackles, was not hog-tying (Dkt. 79 at pp. 44-49; Dkt. 72 at p. 57).  Sgt. Reimer testified that it was appropriate to attach 18 inch shackles to a prisoner's handcuffs and ankle shackles to prevent an inmate from resisting (Dkt. 87 at p. 29-30). Further, even if the restraint method Dupree used constituted hog-tying and he was not disciplined, this one incident is not enough to demonstrate a pervasive pattern or policy tacitly approving of that method of restraint.  Plaintiff has not shown that Sheriff Judd endorsed policy or custom of hog-tying prisoners or that he was deliberately indifferent to it, and that his indifference was the driving force behind Dupree's actions.

Finally, Plaintiff asserts that Sheriff Judd's failure to employ policies and training on the use of the electronic shield and cell extractions was the driving force behind the use of excessive force on Griffin.  In limited circumstances, an inadequate training claim can support § 1983 liability.  *Bd. of the County Comm'Rs v. Brown*, 520 U.S. 397, 407 (1997) (citing *Canton v. Harris*, 489 U.S. 378,

---

[19] Plaintiff asserts that Defendant Despirito "never had formal training on the shield." (Dkt. 109 at p. 34). Defendant Despirito, however, testified that he never used the shield, and there is no evidence to contradict that testimony (Dkt. 73 at p. 22).

387 (1989)).  Further, "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability."  *Id*. at 409 (citing *Canton*, 489 U.S. at 390 n.10).

Sgt. Marcum testified that although cell extraction training courses exist, the Polk County Sheriff's Office does not provide specific training on cell extractions (Dkt. 79 at pp. 36-43). Defendant Dort also testified that they receive no formal training on cell extractions (Dkt. 70 at p. 18).  Instead, the officers rely on their training in defensive tactics (Id.).  Defendant Galloway, who was in charge of Griffin's extraction, testified that he was not sure if there was any policy regarding cell extractions (Dkt. 82 at p. 86).  Defendants' expert, Gary DeLand, related that the officers did not have specialized training in cell extractions (Dkt. 92 at pp. 96-97).  He stated that specialized training on cell extractions "would be useful" and would "increase the level of effectiveness."  (Id. at pp. 97; 100).

Plaintiff also contends that Sheriff Judd failed to employ training on the use of the electric shield, including the number of times it should and for how long an officer may emit the electricity during each use.  Sgt. Marcum testified that the officers are not trained on how long they may hold the electronic shield on a prisoner (Dkt. 79 at p. 24).  The officers were trained that they could use the electronic shield as many times as necessary to gain a prisoner's compliance (Dkt. 71 at p. 32). Plaintiff's expert, Tucker, opined that the International Association of Chiefs of Police, Legal Advisors Section recommended in 2005 that because of "proximity deaths" that occurred following the use of conducted energy devices, that officers use no more than three shocks in a row (Dkt. 91-1 at p. 15).  Plaintiff's medical expert, Dr. Anderson, opined that the combination of the use of the

electronic shield and the positional asphyxia resulted in Griffin's respiratory failure and death (Dkt. 89 at p. 24).

Viewing the evidence in the light most favorable to the Plaintiff, a jury could find that the lack of training and policies on the use of the electronic shield and cell extractions was the moving force behind the officers' alleged use of excessive force. There are disputed issues of material fact on this claim. Accordingly, Sheriff Judd's Motion for Summary Judgment on this part of Count VIII is due to be denied.

ACCORDINGLY,

1.      Defendants' Motion to Strike Testimony of Melvin Tucker (Dkt. 113) is **DENIED**.

2.      Defendants' Motion to Strike Exhibits 2 Through 22 of Plaintiff's Reply to Defendants' Motion for Summary Judgment (Dkt. 114) is **GRANTED**, in part, solely to the extent that the Court will not consider Exhibit 21 (Dkt. 109-21) in ruling on Defendants' motion for summary judgment.

3.      As for Defendants' Motion for Summary Judgment (Dkt. 57), the motion is **GRANTED** as Counts I, Count II *in part* (as to negligent use of excessive force claim), Counts VII, IX, and XI. The motion is DENIED in all other respects.

**DONE AND ORDERED** this _25th_ day of March, 2011.

JAMES D. WHITTEMORE
United States District Judge

Copies to:
Counsel of Record

-48-